Filed 8/10/16  P. v. Torres CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B255717 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA126979) |
| v. | |
| JESUS TORRES et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Judgment affirmed as modified as to Jesus Torres; judgment affirmed and remanded as to Miguel Quintanilla.

Thomas K. Macomber, under appointment by the Court of Appeal, for Defendant and Appellant Jesus Torres.

Meredith J. Watts, under appointment by the Court of Appeal, for Defendant and Appellant Miguel Quintanilla.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

A jury convicted Miguel Quintanilla and Jesus Torres of two counts each of attempted premeditated murder and several other crimes, and found true firearm, gang, and other special allegations. Torres was 15 years old at the time of the crimes. Quintanilla was 21 years old. The trial court sentenced both defendants to 80 years to life. We reject Quintanilla's challenges to his conviction, and conclude Torres's constitutional challenge to his sentence is moot under *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*). We remand for the trial court to determine under *Franklin* whether Quintanilla is entitled to a hearing to present evidence relevant to his future youthful offender parole hearing.

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Crimes*

On February 10, 2013 Bryan Carmona and an acquaintance he knew only as "Ammo" were smoking a "blunt" (a hollowed-out cigar filled with marijuana) in a hallway near the entrance to an apartment building. The building was in an area claimed by the Compton Varrio Setentas criminal street gang, also known as CV-70, near an area claimed by a rival criminal street gang, Compton Varrio Segundos, also known as CVS.

Torres, who was 15 years old and a member of the CVS street gang, and who Carmona knew from school as "Fat Boy," entered the building and asked Carmona where he was from. Carmona backed away, and responded, "I don't bang." Torres began shooting at Carmona and his companion, firing eight or nine shots from very close range.[1] Carmona testified he "heard gunshots go off . . . mad shots" that were

---

[1]    Carmona was reluctant to make an identification of Torres at trial. When the prosecutor asked if the shooter was Torres, who was sitting in the courtroom, Carmona said, "Something like that," and "Close to, yes." Carmona explained that he did not want to participate in the trial, "not even one percent," because when people snitch "they get a

2

"countless." After shooting Carmona, Torres said, "Segundos mas," or "This is how Segundos gets down." Torres ran out through the front entrance of the apartment complex, and got into a stolen red Honda driven by Quintanilla, who drove away.

Law enforcement arrived and found Carmona suffering and bleeding from gunshot wounds. The injuries of Carmona's companion appeared more threatening. Deputies recovered several fired cartridge casings from the scene.

A short time after the shooting, Torres and Quintanilla were arrested after a high-speed police chase that ended with the red Honda colliding with a wall or fence. Quintanilla was in the driver's seat and Torres was in the back seat. One of the deputies performed a gunshot residue test on Torres and Quintanilla's hands.

During the pursuit one of the deputies observed "a hand come out of the window or extend out of the window on the passenger's side . . . and then we saw a black object fly out of the car." Another deputy recovered a gun that a witness had heard hit her car and fall to the ground as a red car followed by a patrol car sped by her and her husband. A firearms expert determined that the cartridge casings recovered from the apartment building where Carmona was shot came from the weapon the deputies had recovered from the street that evening.

Carmona spent a week in the hospital, where doctors had to remove one of his kidneys. Law enforcement interviewed Carmona several times in the hospital, and he said Torres was the shooter.

B.     *The Charges*

The People charged Torres and Quintanilla (as an aider and abettor) with two counts of attempted willful, deliberate, and premeditated murder (Pen. Code, §§ 187, subd. (a), 664)[2] and one count of grand theft of an automobile (§ 487, subd. (d)(1)). The

little gift, a little surprise" and "they get what they deserve." After an evening recess in the trial, Carmona identified Torres the next morning.

[2]     Undesignated statutory references are to the Penal Code.

3

People also charged Quintanilla with one count of fleeing a peace officer in a vehicle driven in a willful or wanton disregard for the safety of persons or property (Veh. Code, § 2800.2). In connection with the two attempted murder counts, the People alleged that Torres personally used a firearm (§ 12022.53, subd. (b)) and personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subds. (c), (d)), and that a principal personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (e)(1)). The People further alleged, in connection with the attempted murder counts and the grand theft of an automobile count, that Torres and Quintanilla committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C)). The People also alleged that Quintanilla had suffered two prior serious or violent felony convictions within the meaning of the three strikes law (§§ 667, subds. (b)-(j), 1170.12) and had served one prison term for a felony (§ 667.5, subd. (b)).

C.  *The Verdicts and Sentencing*

The jury found Torres and Quintanilla guilty on all charges and found true all of the special allegations. The trial court sentenced both defendants to consecutive 40 years to life terms on the two attempted murder counts, consisting of 15 years to life for attempted murder and 25 years to life on the firearm enhancement, for a total of 80 years to life on the attempted murder convictions. The court also imposed concurrent terms of two years for Torres and seven years for Quintanilla on the grand theft conviction, and a term of seven years for Quintanilla on the felony evading police conviction. The court also imposed various fines and assessments, and awarded Torres 459 days of presentencing custody credit. The clerk stated, "459 or plus – ," and the court stated, "It's just 459."

At the sentencing hearing, the trial court stated that "obviously there has been a lot of discussion in the legal world with regard to juveniles who commit crimes," and the court was "well aware of studies that have been done and different court opinions that

4

have reflected those studies, and the court is aware that there is a difference between a juvenile and an adult, to some degree." The court stated, however, that Torres "was 15 years, 10 months old, approximately, when he chose to commit these crimes. And under California law at this point, he can be charged as an adult." The court went on to observe that "this was a classic gang case. And when the court does its evaluation as to sentencing, the court has to look at mitigating, aggravating, also when it's a juvenile, the court does consider and take that into consideration, his age, and the different studies that have been involved with regard to adults versus juveniles." The court then noted that Torres had no prior criminal history, "strong family support," and had "done well while in custody."

The court went on to emphasize the facts of the case. The court stated that it had "to balance what happened in this case. And just to remind everybody, in this case the defendant was hanging out with an older gang member" who belonged to the same gang. "They got a loaded handgun. They came in possession of a stolen vehicle. They drove to rival gang territory. I believe the apartment there was the hub of a rival gang. So incredibly, incredibly bold. The defendant got out of the car, he walked up to the apartment complex. . . . It wasn't just like somebody just hanging out in the front yard. He actually had to go through a door, and there was a hallway, and he gets himself into the apartment complex by going through the door. There's a young man, probably the same age as him, sitting on the stairs. There's another man – young man standing there, same age, doing absolutely, positively nothing."

"And the defendant brings out the loaded firearm, and he goes to the young man standing there and says, 'Where are you from?' And the defendant yells out – the kid is saying, 'I'm not from anywhere. I'm not from anywhere,' and was pleading. He pulls out the gun. He points it at this young man, he gets shot in the chest [and] he got shot in the leg . . . and, but for the grace of God, that young man would have been dead. Not through Mr. Torres not trying to kill him or execute him, because he was within feet of him. Then he turns to the other young man . . . and he just started firing, and that kid was shot, I believe, multiple times and ended up losing a kidney, was in the hospital for a

number of days. And, again, but for the grace of God, that kid should have been dead. If it was up to the defendant, we would have had two young adults executed."

"So the court has to weigh what he did versus his age, his history, his socialization, how he's done in custody. However, the court finds his conduct far outweighs that. He had a chance to have a supportive family to keep him out of gangs. He chose the gangs. And, yes, he's young. But – I'm sorry, but you know right from wrong when you're young. And certainly walking into rival gang territory, yelling out your gang name, pulling out the gun, point blank at another human being, shooting multiple times, and then turning to another one, shooting multiple times – I think Mr. Torres knew exactly what he was doing, despite his age."

### D. *The Appeal*

Quintanilla and Torres filed timely notices of appeal. Quintanilla challenges his conviction (but not his sentence), arguing that the trial court abused its discretion by refusing to admit into evidence certain medical records under the business records exception to the hearsay rule that purportedly showed that Quintanilla was intoxicated on the day of the shootings. Quintanilla also argues that, although the trial court gave several instructions on voluntary intoxication, the court erred by failing to instruct the jury that voluntary intoxication can negate the premeditation element of attempted murder.

Torres challenges his sentence (but not his conviction), arguing that the trial court's sentence of 80 years to life was the functional equivalent of a sentence of life without the possibility of parole, and that, because he was 15 years old at the time of the crimes, his sentence violated the Eighth Amendment's prohibition on cruel and unusual punishment. Torres also contends the trial court erred in calculating his presentence custody credits.

# DISCUSSION

## A. *Quintanilla's Appeal*

### 1. *The Trial Court Did Not Abuse Its Discretion by Excluding Quintanilla's Medical Records*

Quintanilla's defense "was that he was so profoundly intoxicated – debilitated and disoriented by the influence of drugs and alcohol – that he did not know what was going on, and could not have formed the necessary intent to support a conviction of any of [the] crimes or allegations" against him. Although the trial court instructed the jurors that they could consider evidence of Quintanilla's voluntary intoxication in deciding whether he acted with the requisite specific intents, the court sustained the People's hearsay objection to medical records from the hospital that treated Quintanilla after he was arrested. Quintanilla argues that the trial court abused its discretion because the records were admissible under the business records exception to the hearsay rule, Evidence Code section 1271.

The court considered the admissibility of the medical records several times during the trial. When counsel for Quintanilla first raised the issue, she advised the court that she was seeking to introduce the medical records as business records to show that Quintanilla was treated at the hospital "because he was complaining he was having anxiety attacks, complaining of a drug overdose or whatever," which "supports he was under the influence" when he committed the crimes. The prosecutor objected that "the only indication that [Quintanilla] was high in the medical records come[s] from his own statements, his own complaints," and she objected to "[that] portion of the medical records." The court expressed preliminary concern that the medical records contained "multiple levels of hearsay."

The court returned to the issue of the medical records later in the trial. The court stated, "I'm having some problems with [the medical records], and the reason is that it's based on him saying he ingested some drugs." Counsel for Quintanilla stated she was not

7

seeking to introduce her client's hearsay statements, but the impressions of the doctors, which were "based on their . . . training and experience, as well as at least some symptoms." The court stated that it was concerned "there's a lot of speculation" and no indication what the doctors "even base their opinion on, because every test they seemed to run was negative." Later, the court stated, "I still have a problem with [the] medical records. . . . The basis of anything in hearsay is trustworthiness, and that's what the court is kind of struggling with. [Quintanilla] didn't say what medicine he was using, refused to have a urinalysis. He was given . . . an anti-anxiety drug. It's not a drug to treat overdose. It's nothing along those lines. There's no independent evaluation by way of, like, a heart monitor or seeing the eyes dilated or seeing him acting in a way that would be consistent . . . with an overdose or something of that sort. So I'm having difficulty finding the basis of the trustworthiness because it seems to be the basis of the doctor's opinion is the defendant's own statement." The court also pointed to mistakes in the medical records about Quintanilla. The court stated, "I just don't have a sense of it being trustworthy." Ultimately, the court concluded after reviewing the records that the statements referring to the possibility that Quintanilla may have been under the influence of a drug were "based solely on the defendant's statement, and that is unreliable hearsay," and the court sustained the objection.

The trial court's evidentiary ruling was not an abuse of discretion. (See *People v. McCurdy* (2014) 59 Cal.4th 1063, 1095 ["[w]e review for an abuse of discretion the trial court's rulings on the admissibility of evidence"].) First, the medical records did not have a proper foundation to qualify as business records. "Evidence Code section 1271 provides that '[e]vidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule' if it meets all of the following requirements: '(a) The writing was made in the regular course of a business; (b) The writing was made at or near the time of the act, condition, or event; (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness.' [¶] '"Whether a particular business record is admissible as an

8

exception to the hearsay rule . . . depends upon the 'trustworthiness' of such evidence, a determination that must be made, case by case, from the circumstances surrounding the making of the record." [Citations.]' [Citation.] 'The foundation for admitting the record is properly laid if in the opinion of the court, the sources of information, method, and time of preparation were such as to justify its admission.'" (*People v. Zavala* (2013) 216 Cal.App.4th 242, 246.)

There was no testimony at trial from a custodian or other witness from the hospital regarding any of the requirements of Evidence Code section 1271. No one testified about whether the records were made in the ordinary course of business, whether the records were created at or near the acts, events, or conditions they described, what the documents were or how they were prepared, or about the records' sources of information and method and time of preparation. Quintanilla concedes as much, arguing only that "[t]here is no reason to think they are anything other than what they appear to be" and that "it can be presumed that they were generated by the doctors, nurses, and other medical personnel who attended to [Quintanilla]." There was a declaration by a custodian of records, which, if sufficient, can be enough to qualify records for admissibility under Evidence Code section 1271 without the testimony of the custodian at trial. (See Evid. Code, § 1562 ["[i]f the original records would be admissible in evidence if the custodian or other qualified witness had been present and testified to the matters stated in the affidavit, and if the requirements of Section 1271 have been met, the copy of the records is admissible in evidence"].)

The custodian's declaration, however, was not sufficient. A proper declaration requires that the "custodian or other qualified witness" state "in substance each of the following:" (1) "The affiant is the duly authorized custodian of the records or other qualified witness and has authority to certify the records"; (2) "The copy is a true copy of all the records described in the subpoena duces tecum, or pursuant to subdivision (e) of Section 1560 the records were delivered to the attorney, the attorney's representative, or deposition officer for copying at the custodian's or witness' place of business, as the case may be"; (3) "The records were prepared by the personnel of the business in the ordinary

9

course of business at or near the time of the act, condition, or event"; (4) "The identity of the records"; and (5) "A description of the mode of preparation of the records." (Evid. Code, § 1561, subd. (a).) Although the Legislature amended Evidence Code section 1561 in 1996 to include a statement by custodians describing the mode of preparation of the records (*Cooley v. Superior Court* (2006) 140 Cal.App.4th 1039, 1044-1045), the declaration of the custodian of records here did not include such a statement. (See *Sanchez v. Hillerich & Bradsby Co.* (2002) 104 Cal.App.4th 703, 720 [exhibits not admissible as business records under Evidence Code section 1271 where the declaration "contained no evidence as to how the reports were prepared or upon what sources of information they were based, or any evidence that the reports were trustworthy"].) The declaration from the custodian of records did not state, or provide any information about, the mode of preparation of the records. Therefore, the medical records did not qualify for the business records exception to the hearsay rule under Evidence Code section 1271, and the trial court did not abuse its discretion in finding that Quintanilla failed to demonstrate the documents' trustworthiness under Evidence Code section 1271, subdivision (d). (See *Taggart v. Super Seer Corp.* (1995) 33 Cal.App.4th 1697, 1706-1707.)

Second, the trial court was justifiably concerned about trustworthiness. (Evid. Code, § 1271, subd. (d); see *People v. Hovarter* (2008) 44 Cal.4th 983, 1011 [party offering the evidence pursuant to Evidence Code section 1271 has the burden of establishing trustworthiness].) Although diagnostic opinions contained in medical records may be admissible if they are statements of fact or condition based on direct observations by the health care provider (see *People v. Beeler* (1995) 9 Cal.4th 953, 981; *People v. Reyes* (1974) 12 Cal.3d 486, 503), it is unclear whether the notations in the medical records here were based on direct observations of, or objective tests run on, Quintanilla, or whether they were based on statements by Quintanilla to the doctors and nurses at the hospital. For example, the medical records Quintanilla sought to introduce included statements that the "reason for visit" was "altered mental status," Quintanilla's "Chief Complaint" was "Possible Overdose," "patient presents to the emergency department with a possible overdose," patient "admits to smoking unknown substance

10

tonight, admits to hx [history] of meth use in the past," and "patient has a confirmed or suspected inhalation, of unknown drug" and "states he smoked an unknown drug today." These statements all appear to be notes by doctors or nurses recording statements by Quintanilla. In addition, there was no indication in the records of any blood, urine, or other test results indicating the level of intoxicants, if any, in Quintanilla's system.[3] On the other hand, there is a reference in Quintanilla's discharge instructions to a "diagnosis of Altered Mental Status [and] Drug Abuse," "Differential diagnosis: Ingestion/exposure to methamphetamines," and "ROS," or review of systems, "[p]ositive for altered mental status." These notations could indicate a medical diagnosis, although the review of systems technique consists primarily of gathering information from the patient.[4] Faced with these statements in the medical records, and in the absence of any witness to explain them, the trial court acted well within its discretion in excluding the records under Evidence Code section 1271. (See *People v. Hovarter*, *supra*, 44 Cal.4th at p. 1011 ["[a] trial court has broad discretion in determining whether a sufficient foundation has been laid to qualify evidence as a business record"].)

Finally, any error in excluding the medical records was harmless because there is no reasonable probability that the result would have been more favorable to Quintanilla had the trial court admitted the records. (See *People v. DeHoyos* (2013) 57 Cal.4th 79, 120 [evidentiary rulings are subject to harmless error review under the standard in *People*

---

[3] The medical notes and toxicology report indicate that Quintanilla was "unwilling to give [a] urine sample" and his blood tested negative for alcohol.

[4] "A review of systems is a screening tool that relies on a patient's verbal history and consists of an inventory of the body systems. [Citation.] When conducting a review of systems, the medical provider poses to the patient a series of questions, arranged by organ system, that are designed to elicit the patient's signs and symptoms and uncover dysfunction or disease. The review of systems does not represent the medical provider's diagnosis, but provides information useful in making that assessment." (*Spurlock v. Astrue* (S.D.W.Va. 2013) 2013 WL 841474, at p. 26, fn. 11.)

11

*v. Watson* (1956) 46 Cal.2d 818, 836]; *People v. Reed* (1996) 13 Cal.4th 217, 231 [same].) The few isolated and unexplained references in the medical records to "altered mental status" and drug usage were not particularly strong evidence that Quintanilla was so voluntarily intoxicated earlier in the evening that he was incapable of forming the specific intent for attempted murder at the time of the crimes. (See *People v. Eubanks* (2011) 53 Cal.4th 110, 151 ["any error in excluding the statement was harmless given the limited probative value of the proffered evidence"].) As the trial court noted, the records were unclear, difficult to decipher, and included "a lot of speculation." They appear to suggest that the medical professionals at the hospital treated Quintanilla not for intoxication, but for anxiety, with a "Lorazepam injection," after which Quintanilla was "markedly improved." Moreover, there was other, stronger, and more temporally significant evidence counsel for Quintanilla could and did use to argue voluntary intoxication. The deputy who chased and then arrested Quintanilla testified that he believed Quintanilla "was a drunk driver at the time because of the way he was driving" and, after the crash, the deputy thought Quintanilla looked like he was drunk "at that point" and appeared to be "having an anxiety attack or something of that sort." Thus, as Quintanilla concedes, there was "other evidence of his impairment from the officer witnesses on scene to support his defense that he was unable to form the necessary mental states . . . for the offenses charged."[5]

---

[5] Although Quintanilla correctly points out that "[e]vidence of [his] intent to participate in shootings was entirely circumstantial," Quintanilla does not challenge the sufficiency of the evidence supporting his convictions. In addition, the harmlessness of any error in not admitting the medical records disposes of Quintanilla's argument, in a footnote, that trial counsel's failure to present any testimony on the identity or mode of preparation of the medical records constituted ineffective assistance of counsel "since the records were a major basis for the defense offered." There is no reasonable probability Quintanilla would have been acquitted had the court admitted the medical records. (See *People v. Johnson* (2016) 62 Cal.4th 600, 653 [in evaluating claims of ineffective assistance of counsel, courts must consider "'"'"whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome"'"'"].)

### 2. *The Trial Court Did Not Commit Prejudicial Error in Instructing the Jury on Voluntary Intoxication*

The trial court gave instructions on voluntary intoxication. The court instructed the jury that it could consider voluntary intoxication in determining whether Quintanilla had the required mental state as an aider and abettor, whether he had the necessary specific intent to kill for attempted murder charges, and whether he had the necessary specific intent to deprive the owner of the red Honda of his or her property permanently or for an extended period of time for the grand theft charge. The court also instructed that the jury could not consider voluntary intoxication for any other purpose, and that voluntary intoxication was not a defense to the charge of evading the police. Quintanilla argues that the trial court erred by not instructing the jury that it could consider voluntary intoxication to negate premeditation and deliberation.

As the People correctly argue, however, the court did not have a sua sponte duty to give an instruction that involuntary intoxication can negate premeditation and deliberation, and Quintanilla did not ask for such an instruction. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1217 ["absent a defense request, the trial court had no duty to instruct" on "how voluntary intoxication may have affected his ability to form the specific intent necessary"]; *People v. Verdugo* (2010) 50 Cal.4th 263, 295 ["'[a]n instruction on the significance of voluntary intoxication [on the defendant's ability to form the mental state necessary for murder] is a "pinpoint" instruction that the trial court is not required to give unless requested by the defendant'"]; *People v. Hughes* (2002) 27 Cal.4th 287, 342 ["trial court has no sua sponte duty to instruct that voluntary intoxication may be considered in determining the existence of premeditation and deliberation"]; *People v. Saille* (1991) 54 Cal.3d 1103, 1121 ["trial court was not required sua sponte to give 'pinpoint' instructions relating voluntary intoxication to the elements of the crime—malice and intent to kill"].) Because Quintanilla did not request such an instruction, he forfeited the argument. Quintanilla does not argue otherwise.

13

In any event, the court's instructions on attempted premeditated murder and voluntary intoxication adequately instructed the jury on those issues. "'"'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]" [Citation.] "'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'"'" (*People v. Bryant* (2014) 60 Cal.4th 335, 433.) As the People point out, the trial court instructed the jury that the People had to prove beyond a reasonable doubt that Quintanilla "acted with the particular intent" required "for each crime," that attempted murder required "a specific intent or mental state," that he "intended to kill," and that he did so "willfully and with deliberation and premeditation." The court instructed the jury that Quintanilla acted willfully "if he intended to kill when he acted," he "deliberated if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill," and he premeditated "if he decided to kill before acting." And the court told the jury it could consider voluntary intoxication in determining whether Quintanilla had the requisite mental state for aiding and abetting liability and for attempted murder. As the Supreme Court stated in *People v. Castillo* (1997) 16 Cal.4th 1009, these "instructions adequately advised the jury to consider the evidence of intoxication on the question of premeditation, and . . . an additional instruction stating the obvious—that premeditation is a mental state—was unnecessary. Moreover, the court did not breach its duty to instruct correctly once it decided to instruct on voluntary intoxication. The instructions allowed the jury to consider fully the effect, if any, that defendant's claimed [drug] use had on the degree of the murder, as well as on the attempted murder and murder charges themselves." (*Id.* at p. 1018; see *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248-1249.)

B.	*Torres's Appeal*

Torres argues that his sentence of 80 years to life is the functional equivalent of life imprisonment without parole and violates the Eighth Amendment's ban on cruel and unusual punishment. The Supreme Court's decision in *Franklin*, *supra*, 63 Cal.4th 261, however, moots Torres's appeal.

1.	*Eighth Amendment Principles*

a.	*United States Supreme Court Cases*

The Eighth Amendment, which applies to the states,[6] "prohibits imposition of a sentence that is grossly disproportionate to the severity of the crime." (*Ewing v. California* (2003) 538 U.S. 11, 20-21.) In *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), the United States Supreme Court held that sentencing a juvenile to life without the possibility of parole for a nonhomicide offense violates the Eighth Amendment's prohibition of cruel and unusual punishment. (*Id.* at p. 82; see *Montgomery v. Louisiana* (2016) ___ U.S. ___, 136 S.Ct. 718, 732 ["the Eighth Amendment bars life without parole for juvenile nonhomicide offenders"].) The Supreme Court in *Graham* relied on scientific studies showing the "fundamental differences between juvenile and adult minds" and that "[j]uveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults." (*Graham*, at p. 68.)

In *Miller v. Alabama* (2012) 567 U.S. ___, 132 S.Ct. 2455, the Supreme Court, following *Graham*, held that a mandatory sentence of life imprisonment without the possibility of parole for a juvenile convicted of murder also violates the Eighth Amendment. (*Miller*, *supra*, 567 U.S. at p. ___, 132 S.Ct. at pp. 2467-2468.) The Supreme Court explained that a mandatory life sentence "precludes consideration of [the

---

[6]	*Robinson v. California* (1962) 370 U.S. 660; *People v. Caballero* (2012) 55 Cal.4th 262, 265, fn. 1.

juvenile's] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." (*Id.* at p. 2468.) The Supreme Court concluded that the reasoning of *Graham* "implicates any life-without-parole sentence for a juvenile . . . ." (*Id.* at p. 2458.) Although the Supreme Court did not prohibit sentencing juveniles convicted of murder to life imprisonment without the possibility of parole, the Supreme Court held that courts sentencing juveniles in murder cases must consider the juvenile's age and characteristics before imposing a sentence of life without parole. (*Id.* at pp. 2467, 2471.)

In *Montgomery v. Louisiana, supra*, ___ U.S. ___, 136 S.Ct. 718, the Supreme Court held that *Miller* was "retroactive to juvenile offenders whose convictions and sentences were final when *Miller* was decided." (*Id.* at p 725.) In holding that *Miller* was a substantive rule of constitutional law that must be retroactive (*id.* at p. 736), the Supreme Court summarized and reaffirmed the principles the Court had articulated in *Miller*: "'[C]hildren are constitutionally different from adults for purposes of sentencing.' [Citations.] These differences result from children's 'diminished culpability and greater prospects for reform,' and are apparent in three primary ways:

"'First, children have a "lack of maturity and an underdeveloped sense of responsibility," leading to recklessness, impulsivity, and heedless risk-taking. Second, children "are more vulnerable to negative influences and outside pressures," including from their family and peers; they have limited "control over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievable depravity."'

"As a corollary to a child's lesser culpability, *Miller* recognized that 'the distinctive attributes of youth diminish the penological justifications' for imposing life without parole on juvenile offenders. [Citation.] Because retribution 'relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as with an adult.' [Citations.] The deterrence rationale likewise does not suffice, since 'the same characteristics that render juveniles less culpable than adults—their immaturity,

16

recklessness, and impetuosity—make them less likely to consider potential punishment.' [Citation.] The need for incapacitation is lessened, too, because ordinary adolescent development diminishes the likelihood that a juvenile offender '"forever will be a danger to society."' [Citations.] Rehabilitation is not a satisfactory rationale, either. Rehabilitation cannot justify the sentence, as life without parole 'forswears altogether the rehabilitative ideal.'

"These considerations underlay the Court's holding in *Miller* that mandatory life-without-parole sentences for children 'pos[e] too great a risk of disproportionate punishment.' [Citation.] *Miller* requires that before sentencing a juvenile to life without parole, the sentencing judge take into account 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' [Citation.] The Court recognized that a sentencer might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified. But in light of 'children's diminished culpability and heightened capacity for change,' *Miller* made clear that 'appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.'" (*Montgomery v. Louisiana*, *supra*, ___ U.S. at pp. ___, 136 S.Ct. at pp. 733-734.)

b.      *California Supreme Court Cases*

The California Supreme Court has had several opportunities to apply the principles of *Graham* and *Miller* to cases involving sentencing of juveniles. In *People v. Caballero* (2012) 55 Cal.4th 262 the California Supreme Court held that *Graham* and *Miller* apply to a juvenile who, although not sentenced to life without parole, was sentenced to the functional equivalent of life without parole (in that case, 110 years to life). (*People v. Caballero,* at pp. 268-269.) The Supreme Court held that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment," even when the sentence is an aggregate sentence for separate crimes (in that case, three gang-related attempted

17

murders). (*Ibid*.) The Supreme Court explained that "the state may not deprive [juveniles] at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future." (*Id.* at p. 268.) A sentencing court must consider the juvenile's age, physical and mental development, and other mitigating circumstances, "so that it can impose a time when the juvenile offender will be able to seek parole from the parole board." (*Id.* at p. 269.)

In *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*), the California Supreme Court held that section 190.5, which "confers discretion on a trial court to sentence a 16- or 17-year-old juvenile convicted of special circumstance murder to life without parole or to 25 years to life," did not establish a presumption in favor of life without parole. (*Id.* at p. 1360.) The Supreme Court again recognized *Graham*'s ""'flat ban" on life without parole sentences for juvenile offenders in nonhomocide cases . . . .'" (*Id.* at p. 1378; see *People v. Lewis* (2013) 222 Cal.App.4th 108, 118 ["[a]n LWOP sentence may not be imposed against a juvenile offender for nonhomicide offenses"].)

Finally, in *Franklin*, *supra*, 63 Cal.4th 261, the California Supreme Court held that *Graham* and *Miller* apply to juveniles who are sentenced to the functional equivalent of life without parole for a homicide offense. The Supreme Court held that "a juvenile may not be sentenced to the functional equivalent of [life without parole] for a homicide offense without the protections outlined in *Miller*." (*Franklin*, at p. 276.)


2.      *Sections 3051 and 4801 Moot Torres's Appeal*

The Legislature responded to *Graham*, *Miller*, and *Caballero* by enacting section 3051, effective January 1, 2014. Section 3051 establishes a "parole eligibility mechanism" that allows juveniles sentenced to a lengthy determinate term or an indeterminate life term to seek release on parole after serving a prescribed term of confinement if they can demonstrate they have "rehabilitated and gained maturity." (Legis. Counsel's Dig., Sen. Bill No. 260, Stats. 2013, ch. 312, § 1 (2013-2014 Reg. Sess.); see Stats. 2013, ch. 312, § 1 ["[i]t is the intent of the Legislature to create a process by which growth and maturity of youthful offenders can be assessed and a

18

meaningful opportunity for release established"].) Section 3051, as amended effective January 1, 2016, states that "any prisoner who was under 23 years of age at the time of his or her controlling offense" shall be provided "[a] youth offender parole hearing . . . for the purpose of reviewing the [prisoner's] parole suitability . . . ." (§ 3051, subd. (a)(1).) "A person who was convicted of a controlling offense that was committed before the person had attained 23 years of age and for which the sentence is a life term of 25 years to life shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing . . . ." (§ 3051, subd. (b)(3).) Section 4801, subdivision (c), provides that the Board of Parole Hearings "shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law."

The People argue that section 3051, which will allow Torres to apply for parole in his 25th year of incarceration (when he will be 40 years old), "renders moot [Torres's] cruel and unusual punishment claim because it provides a meaningful opportunity for release on parole during his lifetime." In *Franklin*, *supra*, 63 Cal.4th 261, the California Supreme Court agreed with this argument, and held that "sections 3051 and 4801[,] recently enacted by the Legislature to bring juvenile sentencing in conformity with *Miller*, *Graham*, and *Caballero*," mooted a juvenile offender's claim that his sentence of 50 years to life was unconstitutional. (*Franklin*, at p. 268.) The Supreme Court explained that "section 3051 has changed the manner in which the juvenile offender's original sentence operates by capping the number of years that he or she may be imprisoned before becoming eligible for release on parole. The Legislature has effected this change by operation of law, with no additional resentencing procedure required." (*Id.* at pp. 278-279.)

Thus, because of sections 3051 and 4801, Torres, like the juvenile defendant in *Franklin*, "is now serving a life sentence that includes a meaningful opportunity for release during his 25th year of incarceration," and "[s]uch a sentence is neither [life

without parole] or its functional equivalent." (*Franklin*, *supra*, 63 Cal.4th at p. 280.) Under *Franklin*, Torres's constitutional challenge to his sentence is moot.

3.    *Torres's Presentence Custody Credits Must Be Corrected*

Torres is entitled to presentence custody credits from the date of his arrest to the date of his sentencing (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48), and up to an additional 15 percent of his presentence credits under section 2933.1. (See §§ 2933.1, 667.5, subd. (c)(12); *People v. Duff* (2010) 50 Cal.4th 787, 794; *In re Reeves* (2005) 35 Cal.4th 765, 780; *People v. Cardenas* (2015) 239 Cal.App.4th 220, 234.) Torres argues, the People concede, and we agree that, in addition to the 459 actual days of presentence credit the trial court awarded, Torres is entitled to 68 days of conduct credit (459 x .15 = 68.85), for a total credit of 527 days. (See *People v. Andrade* (2015) 238 Cal.App.4th 1274, 1310-1311.)

C.    *Although Torres Is Not Entitled to a Remand for a <u>Franklin</u> "Baseline" Hearing, Quintanilla Is*

Although the California Supreme Court in *Franklin* held that the juvenile offender "need not be resentenced," the Supreme Court in that case could not determine whether the juvenile had sufficient opportunity in the trial court "to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing." (*Franklin*, *supra*, 63 Cal.4th at p. 284.) Therefore, the Supreme Court remanded "the matter to the trial court for a determination of whether [the juvenile] was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." (*Ibid.*) The Supreme Court concluded, "If the trial court determines that [the juvenile] did not have sufficient opportunity, then the court may receive submissions and, if appropriate, testimony pursuant to procedures set forth in section 1204 and rule 4.437 of the California Rules of Court, and subject to the rules of evidence. [The juvenile] may place on the record any documents, evaluations, or testimony (subject to cross-examination) that may be relevant at his eventual youth

20

offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors.  The goal of any such proceeding is to provide an opportunity for the parties to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the Board, years later, may properly discharge its obligation to 'give great weight to' youth-related factors (§ 4801, subd. (c)) in determining whether the offender is 'fit to rejoin society' despite having committed a serious crime 'while he was a child in the eyes of the law.'"  (*Id.* at p. 284.)

We asked the parties to submit supplemental briefs on whether this court should remand the matter "to the trial court for the limited purpose of determining whether [Torres] was afforded an adequate opportunity to make a record of information that will be relevant to the Board [of Parole Hearings] as it fulfills its statutory obligations under [Penal Code] sections 3051 and 4801."  (*People v. Franklin*, *supra*, 63 Cal.4th at pp. 286-287.)  We conclude that Torres is not entitled to a similar limited remand.

At the sentencing hearing, counsel for Torres had the opportunity to present evidence and argument regarding the issue of Torres's age, maturity, and other youth-related factors.  Counsel for Torres argued at the sentencing hearing that the trial court "had to conduct [a] hearing and take into consideration the entire background of the juvenile at the time."  Counsel for Torres stated, "I have a few members of his family, as well as the chaplain from Sylmar here, who was kind enough to come and . . . speak on Mr. Torres's behalf. . . .  I would ask the court to take into consideration fashioning an appropriate sentence now, something that does not leave to the parole department the discretion after 25 years, but the court can fashion an appropriate sentence here, based on [Torres's] age and his immaturity.  As we all know, children are children, and they make bad decisions.  And I think what the court is seeking to recognize is that a 15- or 16-year-old child, even though they make decisions that effect other people's lives, really [does not] understand the consequences and the repercussions of that.  And that it's a violation of cruel and unusual punishment to treat them like adults when their brains and their

21

minds and their intellects and their abilities haven't developed to the point where they even make rational decisions."

Counsel for Torres further argued that "case law, in medical documents, and just common sense allows us to know that children are just that, and their brains are not fully developed until they're about 21 years old. So to treat them as adults, to directly file and give them the same punishment – and oftentimes in situations where it's gang involvement or whatever, we know that the older people recruit the younger people, knowing . . . or believing that they can get them to do things and can manipulate them. And even with good parents and loving parents, these kids are [susceptible] to older people influencing them and they make bad decisions. I think the codefendant in this case was in his 20s and was the driver, and . . . again, it's a manipulation by these older people. They get the young kid to do something, knowing that . . . he doesn't know any better."

Torres also presented evidence on the youthful offender issues. Torres's cousin testified, "I believe that all of us, during our young years, and especially childhood, we all make mistakes. And I believe that all of us deserve a second chance. Especially when we make decisions as children, we are not mature enough, and we don't think about the consequences of what we do." A family friend testified that Torres "allowed others to influence him" and may have been "seduced" by "stronger ones," and the friend asked the court to "be aware of a young man who, because of a mistake he made" is going to prison "with no chance." The Co-Director of the Office of Restorative Justice of the Archdiocese of Los Angeles, who supervises the Catholic Detention Ministry programs in juvenile halls and probation camps in Los Angeles, Ventura, and Santa Barbara, and who advocated in Sacramento for the passage of section 3051, testified that Torres "stood out" for his "good heart [and] his desire to try to participate in whatever positive there is at the halls." He stated that Torres was "one of those people" who, "if given a second chance," would dedicate his life to helping others "so they don't fall into the same mistakes that they did as children." Thus, counsel for Torres was aware of the issue and

had the opportunity to and did present evidence and argument on Torres's immaturity, lack of judgment, and related characteristics.

Torres contends that, although his trial counsel "was aware of the factors from section 3051 at sentencing," she "informed the court that she had been in trial for the entire month preceding sentencing and there was not sufficient time for her to gather relevant information except from [Torres's] family." The record, however, does not entirely support this contention. The trial court had already granted a motion by Torres under section 1050 for a continuance of the sentencing hearing to allow counsel for Torres to present evidence of Torres's age, background, mental status, and "everything about the juvenile." At the sentencing hearing counsel for Torres said she had only "pretty much been in trial," and she stated she was "prepared with family members to give the court more – a fuller indication of my client and who he is," although counsel indicated Torres's mother would probably not be able to speak because she was "very emotional." Moreover, counsel for Torres did not request another continuance of the sentencing hearing to present any additional witnesses or evidence. In any event, the issue under *Franklin* is not whether, after the continuance, counsel for Torres had enough time to prepare for the sentencing hearing given the pressures of her trial practice, or whether the trial court abused its discretion by not granting another continuance under section 1050. The issue under *Franklin* is whether counsel for Torres had "sufficient opportunity" to present evidence on Torres's youthful characteristics, and the record reflects that she did. And, contrary to Torres's assertion, the hearing was not "missing [ ] any input" from family, friends, and community representatives "with knowledge of [Torres] from *before* the crime."

Quintanilla, however, is in a different situation. At the time of his sentencing in April 2014, section 3051 required the Board of Parole Hearings to conduct youth offender parole hearings for offenders who were under the age of 18 at the time they committed their crimes. As Quintanilla points out in his supplemental brief, he was 21 years old when he committed the crimes in this case. Therefore, at his sentencing hearing in April 2014, section 3051 did not apply to him, and there was no reason to present any

evidence at his sentencing hearing about his level of maturity, characteristics of youth, and other youth-related factors. In fact, counsel for Quintanilla presented no evidence at all.

In October 2015, a year and a half after Quintanilla's sentencing, the Legislature amended section 3051, effective January 1, 2016, to apply to offenders who were under 23 at the time they committed their crimes. Section 3051 now applies to Quintanilla, who, as noted, was 21 at the time he committed his crimes. Therefore, he is entitled to a determination by the trial court whether he had a "sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." (*Franklin*, *supra*, 63 Cal.4th at p. 284.)

## DISPOSITION

The judgments are affirmed. The case is remanded to the trial court for a determination under *Franklin*, *supra*, 63 Cal.4th 261 whether Quintanilla is entitled to a hearing to make a record for his youth offender parole hearing under section 3051. The trial court is also to prepare a corrected abstract of judgment as to Torres to reflect the award of 527 days of presentence custody credits (459 actual days plus 68 days of conduct credit) and to send a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


SEGAL, J.


We concur:


PERLUSS, P. J.                                                                    ZELON, J.


24